

**RECEIVED**

MAR 2 1 2008

Mar 21, 2008

MICHAEL W. DOBBINS

CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

**Plaintiff**
**Ms. Freddie C Batchelor**
**Retired Federal Employee**

**V.**

08CV1658

JUDGE KENNELLY

MAGISTRATE JUDGE ASHMAN

**United States Department of Housing & Urban Development**
**Secretary, Alfonzo Jackson, etl**

## Complaint

### Statement in Support of Complaint of Prohibited Personnel Practices Against, Secretary Alfonzo Jackson, United States Department of Housing & Urban Development

### I Introduction

This statement is filed pursuant to 5 U.S.C. & 1214 in support of the attached complaint alleging the commission of a series of prohibited personnel practices as well as violations of civil service laws, and other acts of malfeasance by US Department of Housing & Urban Development, Secretary Alfonzo Jackson.

### A. The Complainant

Ms. Freddie C Batchelor is a twenty-seven year retired federal employee that underwent several years of discrimination, harassment, retaliation and reprisal for standing for true justice as it relates to the administration of HUD programs. Ms. Batchelor on three separate occasions 1992, 1996 and 2004 reported acts of fraud, waste, mismanagement and abuse to the HUD's Inspector's General Office and Office of Special Counsel. After reporting unlawful, unethical activities being performed by high management officials Ms. Batchelor was drastically attacked by management. In 1992 Ms. Batchelor filed an EEO Discrimination Report with the help of union officials. The investigation was not completed because management officials refused to cooperate with investigators and they

*1*

were not made too. Therefore, the department intentionally, delayed specific actions to run the time clock so that legal action could not be done. This action was done on many occasions by HUD and its management officials. There were other individual's employees that were attacked the same way in 2004; Ms. Hazel Ibrahim, Frank Swaba and Ms. Cathy Paul. In each on these instances we as employees attempted to carry out the work as it should have been but higher management had other agendas and plans.

### Freddie Batchelor's Historical HUD Performance Ratings:

Freddie Batchelor had a record of "highly successful" and "outstanding" performance reviews from 1998 through 2003.

| 1998 | Highly Successful |
| 1999 | Outstanding |
| 2000 | Outstanding |
| 2001 | Highly Successful |
| 2002 | Outstanding |
| 2003 | Highly Successful |

In his recognition of s. Batchelor for a financial performance award on January 6, 2003, Administrative Staff Specialist Steven Wagstaff wrote:

> "Ms. Batchelor has taken an active role relative to the new non-filer initiative. Her productivity far exceeds the productivity of other analysts assigned to this program. Due to her relentless efforts she has brought many owners into compliance and has negotiated numerous settlement agreements. The settlement agreements are in amounts which are appropriate relative to the violation. Because of her efforts, the new non-filer initiative has been a success."

### HUD's Plans to Restrict Ms. Batchelor's Leave Right in Late 2003:

On April 10, 2003 Ms. Batchelor requested "Family Leave" because her husband was very sick – in what would become a terminal illness – and was confined to intensive care in the Hines Veterans Administration Hospital. There were numerous email communications between Mr. Gustin and Ms. Batchelor during November and December

of 2003 related to her mediation responsibilities, the needs of her husband and son, her

own health situation and her failure to account properly for short term delays in arrival

for work, personal telephone calls and undocumented absences from her work cubicle.

Mr. Gustin wrote to Ms. Batchelor on December 10, 2003:

> "I want to raise my concern also that you left the AFS Staff meeting yesterday to
> accept, as you described, a personal phone call from Lionel Nixon. In the future,
> please do not leave staff meetings for personal calls absent an emergency
> situation. Please also be mindful, as we discussed, that Mr. Nixon is an agent for
> parties currently in litigation with HUD for matters that the DEC handles.
> Accordingly, pleas ensure that your dialogue with Mr. Nixon does not regard
> HUD policy, procedures or other matters that may at all affect the conduct of this
> litigation or related claims."

Despite Ms. Batchelor's six years of highly successful and outstanding work reviews at
HUD and her mixture of health and personal problems in the fourth quarter of 2003, Mr.
Gustin and the HUD personnel office drafted a leave restriction letter in December of
2003. On December 22, 2003, Mr. Gustin wrote to Ms. Ann Wright of the HUD
personnel office:

> "Ann: I'd like to issue the attached leave restriction to Freddie Batchelor as soon
> as possible. I've tailored it after prior models. Would you please look at it and let
> me know if it is OK? Can you let me know if this requires any prior notice to the
> Union? I've looked at the Union Contract (at least the parts I have) and Section 9
> of the AWS Handbook, and it doesn't seem to require prior notice.....but just in
> case I wanted to ask."

The year ended with communications between Mr. Pollock, Mr. Gustin, and Ms.
Batchelor and the Union which were prompted by Ms. Batchelor's involvement of the
Union in her disagreement with Mr. Gustin and Mr. Pollock over whether her Christmas
period absences should be AWOL (absent without leave) or LWOP (leave without pay.)
In the end Mr. Gustin agreed to classify her absences LWOP.

### Events from February 2004 to March 16, 2004:

On February 11, 2004, Ms. Batchelor wrote to the Union President, Yvonne Hannah,
requesting a work reassignment and complaining of harassment and discriminatory
treatment and the improper use of her computer by others, leading to missing files and
incorrect entries, which her superiors viewed as mistakes in her work. This led to the
Whistle Blower claim that she filed with the HUD Inspector General in February 2004.

On March 8, 2004, Ms. Hannah wrote to Mr. Pollock after a month of the same types of treatment Ms. Batchelor had complained of on February 11, 2004:

> "Are these policies designed and carried out only at the expense of Ms. Batchelor?  It is the Union understands that she is the only one that "special" time and leave practices are being used against and harassment on the part of management in the Enforcement center, which is not new. These are matters, among others, that has been going on since inception of the office.  If this harassment continues, we will have no choice but to refer this and all other disparate treatments, relative to Ms. Batchelor, to the Office of the Equal Employment Opportunity Commission."

On March 10, 2004, Ms. Batchelor talked with Mr. Joseph Davalos concerning the issues she and Ms. Hannah had discussed with Mr. Pollock.

The same day, on March 10, 2004, Ms. Hannah wrote to Ms. Margie Maisonet, Ms. Wright, Mr. Gustin and others:

> "First, please provide the union with a copy of the HUD official memorandum on use of government property and the date it was communicated to the bargaining unit employees.  I have been told that some employees use the conference room for the reason that I stated.  I am aware you are in D.C. but I don't think it would make a difference if you were here, because the harassment by your supervisors was going on where you were here in this office.  Nothing has changed as far as the animosity, hostility and racist tactics that occur and has always occurred in the Enforcement Center. The person that is being harassed this Month is Ms. Freddie Batchelor, next Month who knows."

**The Incident on March 16, 2004:**

Despite the deterioration of the health of her terminally ill husband (who died in June 2004) and the concern and intervention of the union in the personnel practices of the Departmental Enforcement Center, Mr. Pollock attempted to serve Ms. Batchelor with a "Leave Restriction" notice the afternoon of March 16, 2004.

The incident began about 2:30 PM with Ms. Batchelor complaining that someone had been going through the work papers on her desk and tampering with her computer. Shortly thereafter, Mr. Pollock came to her desk and stood there for a while until she

looked up and saw that he wanted to talk with him in his office. When she went to his office, she saw Ms. Ann Wright for Personnel and a copy of a letter which Mr. Pollock was going to give to her. Mr. Pollock began to close the door. Ms. Batchelor indicated that she wouldn't accept the letter without the attendance of a union representative.

After Mr. Batchelor left Mr. Pollock's office she starting having asthma attacks, coughing and wheezing. She lost her balance and fell. She remained lying on the ground and coughing. The building nurse was called. The ambulance was called. The paramedics arrived, provided her with breathing assistance and medication and took her to the Emergency Room at the Northwestern Hospital where she stayed for several hours.

She returned to the HUD office at 6:00 PM to pick up her belongings, work and laptop computer and returned to her home. There is a question as to how much of Ms. Batchelor's chronic asthma/anxiety conditions were known to Mr. Pollock and Mr. Gustin. She had had two similar attacks during the prior 10 years while working at HUD and her co-workers knew of her condition. There is now a question as to whether her workman's compensation claim was properly filed on her behalf by HUD and the injury she suffered was work related and caused by the actions of her HUD superiors. On March 23, 2004, Mr. Gustin indicated that he was not aware of nor informed that Ms. Batchelor's medical condition impaired her office presence. He also indicated that he was not aware of any medical statement that had provided in response to the Notice. He also indicated that there were 50 incomplete "close out" reports that he alleges were closed out improperly. On April 9, 2004 there were numerous emails between Mr.

5

Gustin, Mr. Pollock, Ms. Izella Harvey and Ms. Maisonet related to "mail delivery," the "laptop computer," and the case management would have "to initiative removal."

**Mr. Gustin Wants to Get Control of Ms. Batchelor's Laptop Computer:**

On April 16, 2004, Mr. Gustin wrote to Ms. Linda Jasper, Ms. Harvey and Mr. Pollock that Ms. Batchelor had been out to the office on a COP (continuation of pay) basis since March 16, 2004. She had called to get her computer password reset. Mr. Gustin instructed the others not to reset her password and in addition stated:

> "(W)hen Ms. Batchelor returns to work we need to convert her current laptop equipment to a tower computer with a regular monitor. We will be asking for Ms. Batchelor's return of the laptop immediately."

Ms. Jasper responded on April 19, 2004 indicating that her account was disabled on April 14, 2004 and that her laptop would be replaced with a desktop on the next day.

On April 19, 2004, Mr. Pollock wrote to Ms. Jasper indicating that the laptop computer would be retrieved when Ms. Batchelor returned on May 3, 2004. He then followed a minute later with another email:

b

"Incidentally, this is a rather sensitive matter that we'd prefer be left between you
and us for the time being. If there are any requirements with respect to union
notification, please coordinate that through us."

On April 26, 2004, Mr. Gustin wrote to Ms. Hannah indicating that they were going to
replace the laptop of Ms. Batchelor indicating that she does not perform off site work or
telecommute. He also indicated that Ms. Batchelor requested that her password could be
reset "so that she could remotely access and use HUD's systems." (Something that she
might need to do to confirm the proper close outs of the 50 properties that Mr. Gustin
commented on in his memo of March 24, 2004). Mr. Gustin regarded this request as
evidence that the use of her laptop computer at home was "the unauthorized use of
federal equipment."

On April 23, 2004 there were a number of emails between Mr. Pollock, Ms. Harvey and
Mr. Gustin where the decision was made that the union did not have to be informed about
the laptop computer with 7 days notice. Mr. Pollock commented on this when he wrote:

"I agree. Seems the better way to handle anyway. What we don't want to do,
though, is notify the union yet, I think we'd rather wait 'til she gets back to give
her as little "prep" time as possible. The last thing we want is he deleting a bunch
of files. We can do it the morning she returns. She's due back on Monday May
3rd."

On April 29, 2004, Mr. Gustin writes to Mr. Donald Boyd of the union, with copies to Mr. Ross, Ms. Harvey and Ms. Hannah, indicating a desire to keep Ms. Batchelor out of the information loop on the communication thread:

> "Thank you for your message. You have allowed me to raise several other concerns that the Union may assist management to resolve. <u>While I noticed that you have copied Ms. Batchelor on your message, I have not copied Ms. Batchelor on mine as I understand she remains under medical care and I do not want a claim that we (the Union or management) have caused her any harm.</u>"

It would seem that if Ms. Batchelor was assigned a laptop for her work before her asthma attack and her duties had not changed, it would be logical for her to take her laptop home with her to continue her work and to work on the 50 "close outs" that Mr. Gustin was concerned about, particularly when it was not clear after being taken to the emergency room on March 16, 2004 when she would return to the office. The day that she had the asthma attack on March 16, 2004 she had been complaining of unknown persons tampering with her computer.

> "With regard to your message below, Ms. Batchelor's duties and job description have not changed. Ms. Batchelor is only in custody of her laptop computer because she returned to her the office, at approximately 6PM the day she was taken to the hospital for an apparent asthma attack, and removed it without

permission and despite her infirmity.  Ms. Batchelor is not authorized to be in possession of the laptop."

Mr. Boyd wrote Gustin on April 30, 2004: "In keeping with your decision to discuss this matter informally, I have not included Ms. Batchelor in our communication."

At 10:32 AM on April 30, 2004, Mr. Boyd wrote to Mr. Gustin indicating that Ms. Batchelor had been in to return her laptop computer. Boxes of her project files were left on her desk when she left. At 10:36 Mr. Gustin responded indicating that the laptop computer should be delivered to Chris Stanley in IT.  At 10:39, Mr. Gustin wrote to Mr. Stanley, with copies to Mr. Pollock and Izella Harvey:

> "Chris, if Freddie or the Union drops her laptop off, please holds it so that we may finalize the analysis that Jim Pollock met with you about.  Much appreciated."

**Key Points:**

- Ms. Batchelor had a uniform evaluation record of "highly successful" and "outstanding" performance reviews from 1998 through 2003.  In 2003, her review stated that because of her efforts the non-filer program was a success.

- In September of 2003, Englewood sued HUD for breach of Contract related to the four year HAP contract at South Pointe, a project for which Ms. Batchelor was the Enforcement Analyst from 1998 through April of 2001.

- In December of 2003, Mr. Gustin drafts a Notice of Leave Restriction against Ms. Batchelor despite her years of outstanding service to HUD and knowing of her personal problems related to her chronic asthma and her husband's terminal health condition, situations that in the best of circumstances would require increased, not decreased, flexibility working conditions and a greater rationale for the use of a laptop computer.

- In February of 2004, Ms. Batchelor filed a "whistle blower" complaint with the HUD Inspector General alleging the improper tampering with her laptop computer when she left it at the office after hours. When she returned she would find that files were missing and new entries would have been made.

- On March 16, 2001 when Mr. Pollock, in the presence of Ms. Wright, called Ms.Batchelor into his office to deliver to her the notice of restricted leave which Mr. Gustin had begun drafting in December of 2003, Mr. Batchelor stated her need for a union representative to be present and left the office. Immediately after this confrontation with Mr. Pollock, Ms. Batchelor suffered an anxiety attack, fell to the floor, and was administered to by a nurse and paramedics. She was then taken in an ambulance to the Northwestern Hospital emergency room.

- After being discharged from the hospital, she returned to her office to retrieve her laptop computer -- she had expressed concern for the security of her data just prior to the confrontation with Mr. Pollock and her subsequent anxiety attack.

- On April 16, 2004, Mr. Gustin and Mr. Pollock started the process of getting Ms. Batchelor's laptop computer back. On April 19, 2004, Mr. Pollock writes to Ms. Jasper that "this is a rather sensitive matter" and there is no need to contact the Union. On April 23, 2004, there were a number of emails developing a strategy for delaying as long as possible the notification of the Union and minimizing the amount of "prep" time for Ms. Batchelor.

- On April 26, 2004, Mr. Gustin converted the natural concern of Ms. Batchelor for the security of her files in her laptop into an "unauthorized use of federal property." On April 29, 2004, Mr. Gustin writes to Mr. Boyd of the Union asking to keep their communications confidential on the pretext that explaining what they were planning could be adverse to her medical condition.

- On April 30, 2004 Mr. Gustin, Mr. Pollock and Mr. Stanley wanted to make sure that when Ms. Batchelor returned her lap top to Mr. Stanley that Mr. Stanley could hold it to "finalize the analysis that Mr. Pollock met with you about.

11

- It is clear that on April 30, 2004, more than seven (7) months after the filing of the Englewood complaint in September of 2003 that Mr. Gustin and HUD had access to Ms. Batchelor's hard copy files and the contents of her laptop computer with her records of her work on South Pointe from 1998 through April of 2001.

## B. Interference in Administration of OWCP Federal Program Benefits

HUD Officials Mr. Gregory Gustin and James Pollock interfered with the processing of Ms. Freddie Batchelor's Workers Compensation Claims in April of 2004 with acts of retaliation and reprisal they gave inaccurate information and made intentional mis-statements on key Department of Labor Forms CA1 and CA17. They reported that Ms. Batchelor caused her own injury at work on March 16, 2004 and there was no precipitating third party that caused her to almost die in the work place where paramedics had to be called and life support mechanisms had to be administered. These officials carried out actions of perjury as well as destroyed documents forwarded to them to give to HUD OWCP contractor and Department of Labor. They also intentionally provided incorrect social security numbers on Ms. Batchelor's paper work which would show that she had no case on file. Ms. Batchelor had no knowledge of what the OWCP file consisted of until February 8, 2008 when under the suggestion of a legal advisor asked her to retrieve the file so that they could review it for her. It indicated the following:

12

## INTRODUCTION

Ms. Batchelor was an outstanding HUD employee who was given an
extraordinarily favorable review in 2003 related to her great "productivity," "relentless
efforts" and responsibility for the success of the new HUD "non-filer" initiative.

However, her superiors at HUD wanted to terminate her employment by making
her life miserable, knowing of her chronic asthmatic condition and her susceptibility to
anxiety attacks under stress. The injury suffered by Ms. Batchelor on March 16, 2004
was the culmination of three months of harassment and hostility, issues which were
serious enough for the HUD Union president to write strongly worded messages on
March 8, 2004 and March 10, 2004 to Ms. Batchelor's superiors at the HUD
Departmental Enforcement Center.

The event precipitating her injury was an attempt by Mr. James Pollock to serve
Ms. Batchelor with a severely limiting "Leave Restriction." Without a HUD Union
representative present, Ms. Batchelor refused to take the Leave Restriction letter.
Immediately after leaving Mr. Pollock's office, suffered an anxiety-induced asthma
attack with her falling to the floor coughing loudly and gasping for breath. Her condition
required medical intervention and an ambulance to the Northwestern Hospital emergency
room. Her existing anxiety and asthma conditions were known to her superiors at HUD.
She had requested work transfers since 2001, the most recent being on March 6, 2004.

Doctors examining and treating Ms. Batchelor throughout 2004 and into 2005
determined that she could not return to work unless her working conditions were changed
significantly to eliminate the harassment and stress she experienced from Mr. Pollock and

Mr. Gustin. None of this important information was contained in the HUD employer reports or in the information provided to the hearing examiner prior to her decision.

## STATEMENT OF FACTS

### Background and Context:

1.    Ms. Batchelor suffered from chronic asthma, which under circumstances of undue stress and harassment, triggered asthma attacks which required medical intervention and hospitalization. Ms. Batchelor had attacks of this kind in 1992 and 1996 while she was working at HUD. Ms. Batchelor's superiors knew, or should have known, of these conditions. Her co-workers were aware of her condition.

2.    Ms. Batchelor's HUD performance ratings between 1998 and 2003 were "highly successful" and "outstanding":

     1998    Highly Successful
     1999    Outstanding
     2000    Outstanding
     2001    Highly Successful
     2002    Outstanding
     2003    Highly Successful

In his recognition of s. Batchelor for a financial performance award on January 6, 2003, Administrative Staff Specialist Steven Wagstaff wrote:

> "Ms. Batchelor has taken an active role relative to the new non-filer initiative. Her productivity far exceeds the productivity of other analysts assigned to this program. Due to her relentless efforts she has brought many owners into compliance and has negotiated numerous settlement agreements. The settlement agreements are in amounts which are appropriate relative to the violation. Because of her efforts, the new non-filer initiative has been a success."

3.    In December of 2003, Mr. Gustin was aware of the personal responsibilities of Ms. Batchelor for her own health needs, her dying husband, and her

14

mediation work for HUD and some litigation involving her son. He knew that she was doing her best to juggle a complex set of responsibilities.

4.     Despite her outstanding history of performance at HUD and her demanding personal needs, Mr. Gustin prepared a draft leave restriction on December 22, 2003 that would severely limit the ability of Ms. Batchelor to be away from her desk or from the office:

> "Ann: I'd like to issue the attached leave restriction to Freddie Batchelor as soon as possible. I've tailored it after prior models. Would you please look at it and let me know if it is OK? Can you let me know if this requires any prior notice to the Union? I've looked at the Union Contract (at least the parts I have) and Section 9 of the AWS Handbook, and it doesn't seem to require prior notice…..but just in case I wanted to ask."

5.     In February of 2004 of 2004, Ms. Batchelor filed a complaint with the HUD Inspector General claiming that one or more of her superiors – Mr. Pollock or Mr. Gustin – had been tampering with her laptop computer after hours, deleting her work files and inserting different information.

6.     From December 2003 through February 2004, Ms. Batchelor was subjected to a constant pattern of harassment by Mr. Pollock and Mr. Gustin.

7.     On March 8, 2004, Ms. Hannah wrote to Mr. Pollock directing her concerns to the same types of treatment Ms. Batchelor had complained of in her February 11, 2004:

> "Are these policies designed and carried out only at the expense of Ms. Batchelor? It is the Union understands that she is the only one that "special" time and leave practices are being used against and harassment on the part of management in the Enforcement center, which is not new. These are matters, among others, that has been going on since inception of the office. If this harassment continues, we will have no choice but to refer this and all other disparate treatments, relative to Ms. Batchelor, to the Office of the Equal Employment Opportunity Commission."

8.      Two days later, on March 10, 2004, Ms. Hannah wrote to Ms. Maisonet in Washington complaining again about the working conditions in the Departmental Enforcement:

> "I am aware you are in D.C. but I don't think it would make a difference if you were here, because the harassment by your supervisors was going on where you were here in this office. Nothing has changed as far as the animosity, hostility and racist tactics that occur and has always occurred in the Enforcement Center. The person that is being harassed this Month is Ms. Freddie Batchelor, next Month who knows."

9.      Because of the animosity and harassment she had experienced at the Departmental Enforcement Center, Ms. Batchelor had requested a reassignment from her position at the Departmental Enforcement Center on four occasions from 2001 through 2004, including the most recent one on March 6, 2004. She understood that her working conditions were dangerous to her health and sought a work transfer.

**The Incident on March 16, 2004, Follow-up Medical Visits and HUD Response:**

1.      On March 16, 2004, Ms. Batchelor was working at her desk and complaining that someone was still tampering with her computer and rummaging through the files in her cubicle and on her desk. This was the same problem she had raised with the HUD Inspector General in February.

2.      Mr. Gustin and Mr. Pollock knew that Ms. Batchelor had a chronic asthma condition that could result in an anxiety attack when confronted with severe stress. They also knew of her husband's terminal health condition and her other personal problems.

3.      Mr. Pollock spent some time at Ms. Batchelor's desk before the incident while she was on the phone motioning her to meet him in his office.

14

4.      When Ms. Batchelor went to the office of Ms. Pollock, she saw a HUD personnel officer in the room.  Mr. Pollock attempted to give her an official Notice of Leave Restriction which had been previously drafted by Mr. Gustin.  Ms. Batchelor said that there had to be advance notice and a union representative present in such disciplinary situations and left Mr. Pollock's office.

5.      Almost immediately after the confrontation in Mr. Pollock's office, Ms. Batchelor had an asthma attack, coughing loudly and wheezing and obviously gasping for breath.  She fell to the floor and stayed there continuing her coughing and gasping for breath. A nurse and paramedics were called.  When they arrived they administered medication and provided breathing equipment. They took Ms. Batchelor to the emergency room at the Northwestern Hospital where she stayed for several hours, was given medication and then discharged. She was directed to follow up with her primary physician and to return to the emergency room if she had additional breathing problems.

6.      On March 17, 2004, she was examined by Dr. Dan Knight at the Michael Reese Emergency Department and was diagnosed with "anxiety" and directed to schedule an appointment with Dr. Daniel Senseng of the Advocate Health Centers at 2545 South King Drive.

7.      On March 22, 2004, Ms. Batchelor was examined by Dr. Senseng, a specialist in Internal Medicine, who concluded that it was "undetermined" when Ms. Batchelor could return to work, but that it was necessary for her to be examined by a mental health counselor.

8.      On March 22, 2004, Ms. Batchelor submitted her CA-1 form to Mr. Pollock claiming an anxiety-induced asthma attack caused by the altercation related to

17

the incidents with Mr. Pollock. It did not contain the materials from Ms. Hannah describing harassment. It obviously did not contain the results of the medical examinations and treatments that Ms. Batchelor received throughout 2004.

9.    On March 22, 2004, Mr. Pollock indicated that he had received the CA-1 report, indicating that he would complete the CA-1 form, forward a copy to Ms. Batchelor and send the original to the HUD Workers' Compensation Center. He never did send a copy to Ms. Batchelor.

10.    Mr. Pollock admitted receipt of the medical visits on March 16, 2004 to Northwestern and on March 17, 2004 to Michael Reese. He provided Ms. Batchelor a copy of From CA-20, Attending Physician's Report so that the reports of her attending physician could be provided to the HUD Workers' Compensation Center.

11.    On March 23, 2004, Mr. Pollock filed his report to the Workers Compensation Center in Alexandria, Virginia, without forwarding a copy of his report to Ms. Batchelor for her review. In it, he said that: a) the employee was not injured in the performance of duty; b) the injury was caused by the employee's willful misconduct, intoxication or intent to injure self or another; c) the injury was not caused by a third party; d) medical reports did not show the employee was disabled for work; and e) the employee was making $83,379 per year at the time of her injury.

12.    In his letter to Ms. Nancy Bond in the Office of Worker's Compensation, of March 23, 2004, Mr. Pollock stated: "This Agency strongly controverts Ms. Batchelor's claim because: (1) management does not believe that Ms. Batchelor was injured, and (2) if Ms. Batchelor had been injured, she intended to bring about such injury."

13.    Mr. Pollock continued in his statement of March 23, 2004:

"I would also like to point out that Ms. Batchelor admits in her statement that she
had not recovered from past respiratory problems, and has also suffered in the
past from anxiety. While we do not refute that Ms. Batchelor has, or has had,
these illnesses, she has not provided medical documentation that these illnesses
require her recurring absences and tardiness to the office, nor has she claimed that
any illnesses have prevented her from conducting her required duties. Further,
none of the medical documentation submitted supports her claim that HUD, its
management, or the duties caused her alleged injuries or her pre-existing illnesses.
Her most recent physician's statement (the March 22, 2004 report of Dr. Senseng)
indicates that Ms. Batchelor will be out for an undetermined period so that she
can see a mental health counselor."

14.    On March 30, 2004, Dr. Senseng examined Ms. Batchelor again and

advised Ms. Batchelor not to return to work. His examination notes indicated that:

"Patient's current disability is not physical, but emotional/psychiatric. Her mental health

counselor will determine when she can return to work."

**Subsequent Events:**

1.    On April 19, 2004, Dr. Joyce Miller, a psychiatrist to whom Ms. Batchelor

was referred by Dr. Senseng examined Ms. Batchelor and concluded that Ms. Batchelor

suffered from "major anxiety" and "depression" after years of harassment at work. Her

history revealed that she had had a similar incident in 1996.

2.    On April 30, 2004, Ms. Batchelor, unable to obtain alternative work at

HUD under conditions compatible with her health needs, returned her laptop computer

and, because she could not get work in the Government compatible with her health

limitations, she had no alternative but to resign from HUD. She expected that the

acceptance of her worker's compensation claim would be sufficient for the transitional

period she would need, with HUD assistance, to find suitable employment within the

Government so that she could continue work for five years to obtain her maximum Federal retirement benefits.

3.      On May 17, 2004, Dr. Miller examined Ms. Batchelor again and diagnosed her as having "major depression." She concluded that the condition was caused by the extreme stress with the incident on March 16, 2004. She said in her report that Ms. Batchelor could not return to work at that time but that a tentative return to work date could be August of 2004.

4.      On July 1, 2003, Kenya Hughes, the HUD case manager directed Myrna Bidot, the outside contractor responsible for making the decision, to: "Upon receipt of this letter please render a decision in the above-referenced claim."

5.      Ms. Batchelor continued to receive medical treatment for her condition throughout 2004 and into the first several months of 2005. The medical advice was that it would be inappropriate to return to any work environment similar to that which she had experienced at the HUD Departmental Enforcement Center.

## ARGUMENT

### Ms. Batchelor's Claim for Worker's Compensation Was Complete and Accurate.

1.      Ms. Batchelor was in the HUD office on March 16, 2004, doing her normal work when the incident which triggered her anxiety and asthma attack occurred.

2.      Mr. Pollock conceded that he was aware of her respiratory problems (asthma) prior to the injury and that those health conditions had continued.

20

3.    Mr. Pollock had engaged in a pattern of hostile and harassing actions against Ms. Batchelor during the month prior to the incident, resulting in challenges to those actions by Ms. Hannah, the HUD Union president, on March 8, 2004.

4.    At the time of the incident, Mr. Pollock knew of Ms. Batchelor's responsibilities to the needs of her terminally ill husband (who would later die in June, 2004), Ms. Batchelor's health condition and her need for a flexible and supportive work environment during that period.

5.    Mr. Pollock asked Ms. Batchelor to meet with him in his office where he attempted to serve Ms. Batchelor with a Notice of Leave Restriction which would severely limit the ability of Ms. Batchelor to meet her needs for a flexible work schedule during her short term period of need.  Mr. Pollock had asked a senior member of the HUD personnel staff to attend the meeting.  There was no union representative present to support Ms. Batchelor.

6.    It was the stressful circumstances that occurred during this meeting that caused Ms. Batchelor to have her anxiety-induced asthma attack which required emergency medical attention, the ambulance and the visit to the Northwestern Hospital emergency room and her subsequent medical treatment throughout 2004 and into 2005.

7.    Ms. Batchelor filed her CA-1 form in a timely manner on March 18, 2004.

**The File Submitted by HUD on Behalf of Ms. Batchelor was Incomplete and Incorrect.**

1.    The CA-17 Supervisory Report and letter attachment submitted by Mr. Pollock on March 23, 2004 was incomplete and contained key misstatements of fact.

21

2.    In his Report, Mr. Pollock simply stated that the injury was "not in the performance of duty" although he provides no factual support for this assertion in his two page letter attached to the Report.

3.    Mr. Pollock also stated in his Report that: "the injury was caused by employee's willful misconduct, intoxication or intent to injure self or another." This assertion is preposterous on its face. In addition, there is no supporting evidence provided on this point in his two page letter.

4.    Mr. Pollock also stated that the injury was "not caused by a third party" when in his letter of March 23, 2004, he wrote: "Immediately following the meeting (with him), Ms. Batchelor had what appeared to be an asthmatic attack in the office." This led to her coughing and gasping for breath, medical intervention, and a trip to the emergency room at the Northwestern Hospital.

5.    Mr. Pollock also said on March 23, 2004 that the medical reports do not show that the employee is disabled for work. However, he said that the medical reports do discuss anxiety and asthma. In fact, Dr. Senseng's medical report on March 22, 2004 indicated that it was "undetermined" when Ms. Batchelor could return to work, and that would be determined by he mental health counselor to whom he referred Ms. Batchelor.

6.    The subsequent medical examinations of Ms. Batchelor on March 30, 2004 (Dr. Senseng), April 19 (Dr. Miller) and May 17, 2004 (Dr. Miller) all concluded that Ms. Batchelor was not capable of returning to work at the time of her visits.

7.    In her report of May 17, 2004, Dr. Miller stated that she believed the injury suffered by Ms. Batchelor was "caused or aggravated by an employment activity," which she believed to be the altercation with Mr. Pollock on March 16, 2004.

8.      Under the circumstances, Mr. Pollock's statements in his CA-17 report and in his letters of March 22 and 23, 2004 should be regarded as biased and self serving since the causes of Ms. Batchelor's injury, in the view of treating physicians, were his harassment of Ms. Batchelor for several months and the "straw that broke the camel's back" confrontation with Ms. Batchelor on March 16, 2004.

9.      There was no consideration of Ms. Batchelor's need for continual medical treatment throughout 2004. In the view of Mr. Pollock, there was no injury, it was not in the course of duty and if there was an injury it was the intention of Ms. Batchelor to injure herself.

**The Result in the Case of Englewood v. United States Give Support to the Credibility of Ms. Batchelor.**

1.      There were similar issues of relative witness credibility in the case of Englewood Terrace v. United States. This was one of the cases that Ms. Batchelor felt that HUD handled improperly which prompted her to complain to the HUD Inspector General in February of 2004. She had one view of the relevant facts and HUD actions. HUD had a starkly contrary view. Judge Horn, the trial judge, found Ms. Batchelor to be "credible." She found the HUD witnesses to be "not credible."

2.      Judge Wolski rejected HUD's jurisdictional motion on August 10, 2004. Judge Horn, the trial judge, found HUD liable for breach of contract on November 30, 2007. In both cases, these Court of Claims judges were critical of the arbitrary and capricious nature of the actions of HUD Chicago, the same characters involved in this claim by Ms. Batchelor.

3.      Senior managers at HUD Chicago, and in particular Mr. Gustin, have developed the habit of making arbitrary and capricious decisions without following their

23

own rules and regulations, to advance objectives that they could not achieve by following

regular procedures.

### HUD Denied Ms. Batchelor Due Process in the Review and Administration of Her Worker's Compensation Claim.

1.    Mr. Pollock did not complete the CA-1 Form which Ms. Batchelor had

submitted to him and then send her a copy of the form that he sent to the HUD Workers'

Compensation Center.  Ms. Batchelor never had the opportunity to review or challenge

the false and misleading statements that Mr. Pollock advanced in his letter of March 23,

2004.

2.    The Claims Examiner, Ms. Myrna Bidot made two conclusions in her

decision that were not supported by the evidence that may or may not have been

reviewed by her.  First, she said:

> "Mere perceptions of harassment or discrimination do not constitute a
> compensable factor of employment.  There must be evidence that harassment or
> discrimination did in fact occur."  Lorraine E. Schroeder, 44 ECAB 323 – 1992

Ms. Bidot appeared not to have presented to her or consider the two emails that Ms.

Hannah, the HUD Union president wrote to Mr. Pollock on March 8, 2004 and Ms.

Maisonet (Mr. Pollock's superior) on March 10, 2004 which was directed to the hostility

and harassment directed to some of the Departmental Enforcement Center employees, in

particular, Ms. Batchelor.

Second, she concluded that since the claimant has not proved the occurrence of

"any employment factor" in the performance of duty, the medical evidence need not be

evaluated.  This view is an illogical and circular proposition.  It was the medical evidence

supplied by the medical report of Dr. Miller on May 17, 2004, where she stated that the

injury suffered by Ms. Batchelor was "caused or aggravated by an employment activity,"

which she believed to be the altercation with Mr. Pollock on March 16, 2004. Her failure

to consider the medical evidence supplied to her by Dr. Miller on May 17, 2004 – "the

medical evidence of record need not be evaluated" – led to her conclusion that "the

claimant has not proved the occurrence of any employment factor in the performance of

duty."

3.   Ms. Batchelor never received a copy of the "Notice of Decision" of July 7,

2004 and had no knowledge of what was in her OWCP file until February

8, 2008 when her lawyer directed her to go to the office at 230 South

Dearborn and get copies of the claims file so that it could be reviewed and

appropriate remedial action taken

4.   There was a total of $200,000 lost in wages plus benefits from the period

of time in question from May, 2004 through December, 2007. This

includes time I have been without the ability to obtain proper employment

since taking a constructive retirement in May, 2004.

**C.) An Investigation was Conducted on Discrimination, Harassment,**

**Reprisal, Retaliation Case Number CH 04 12 M**

Within this case management officials perjured themselves and interfered with the

investigator's interviews. The Investigator for the case put a statement to file that

he was unable to complete because he did not receive documents requested and

the interference was terrible when he interviewed Mr. Gregory Gustin and Mr.

25

James Pollock. Also, within the same investigation Mr. Ed Hinsbergur perjured himself by making false statements in regards to Ms. Batchelor and the accusation of her requesting HUD information after she retired that was untrue because his employee denied it. HUD closed out investigation and made a ruling when they should not have until the remainder of the information needed was received. In addition, one of the individuals that should have been interviewed and documents received for was not. This individual was totally not included although Ms. Batchelor indicated that she was the individual that management treated entirely different from her that like her had a chronic illness. The investigator did not receive this information. Additional, HUD did not forward a copy of their decision that was not valid because the investigation was incomplete. Again Ms. Batchelor's rights to a fair and just investigation was ignored and passed by. HUD again conducted a prohibited practice and did not follow regulations. This was another act of reprisal and retaliation. this occurred after Ms. Batchelor reported a hotline complaint to IG in February, 2004. Ms. Batchelor had also requested several times to be reassigned from the Enforcement Center and request overlooked.

**D) Management Attempted to Bar Ms. Freddie Batchelor from the federal Building**

After being forced into a constructive retirement and losing much income. HUD allowed Mr. James Pollock to write Ms. Freddie Batchelor a letter filled with false statements that she could not come into the building at 77 West Jackson (HUD)

without notifying Ms. Beverly Bishop. The higher management made up a special provision for Ms. Freddie Batchelor yet, another act of reprisal, retaliatory action as well as discriminating. This also occurred after Ms. Batchelor decided to tell the truth and stand on the side of true justice in the case New Englewood Terrace vs. US HUD. Judge Marion Horn ruled in favor of the plaintiff and HUD now has to negotiate a settlement with owners but yet refuses to cooperate in plaintiff receiving justice. The players Mr. Gregory Gustin and James Pollock also issued Ms. Batchelor a letter before she testifies in 2007 that was threatening and mis-stated as to the ethic laws. This was done intentional and as a fear - scare tactic.

**D) Interference with Business Activities**

Ms. Batchelor in 2006 formed a business (Straightway Development Company) since she had been defamed, blackballed and harassed so by HUD. The same HUD officials also interfered with her ability to run and have a successful business. The business ended going under because HUD officials were spreading the word to individuals not to do business with Ms. Batchelor.

**Summary of Prohibited Personnel Practices and Violations of Civil Service Law**

The prohibited personnel practices and violations of civil service law the US Department of HUD has committed include:

- Creation of a hostile work environment arising out of an escalating series of retaliatory acts against career employees, culminating in leave restrictions and denial of Reasonable Accommodations and leave under FMLA of this employee because of protected whistle blowing and/or perceived whistle blowing.

27

- Violations of the First Amendment rights by the issuance of an illegal gag order which prohibited her from communicating with anyone regarding so-called confidential or sensitive internal agency matters without the permission of Alfonzo Jackson or OGC staff.

- Violation of the Anti-Gag statue by imposing a non-disclosure policy on a career staff that fails to include required guarantees regarding employee's statutory free speech rights.

- Violation of the Llyod LaFollette Act, 5 USC & 7211, which guarantees all federal employees the right to communicate with Congress, through a non-disclosure policy.

- The allegations involve not only the commission of prohibited personnel practices and violations of civil service laws, but also numerous acts of malfeasance by Alfonzo Jackson to perform statutory duties. These include the abandonment of merit systems protection guidelines and the merit-based competitive hiring for career positions. Positions from 1998 – 2004 were filled by nepotism and favoritism. The purging away of all staff to make room for friends of the Secretary's or personal picks. There was mis-sue of special hiring authorities.

Secretary Jackson has made a lot of misleading statements to the public and

Congress about the formation and activities of the Departmental Enforcement

Center and its creation and purpose. It is the biggest domestic fraud since

Watergate.

- The False Claims Act
- Required by federal law, employees have a duty to identify and report fraud,
  waste and abuse
- GGD-00-70 Whistleblower Protection
- Civil Rights Act of 1973

- Civil Rights Act of 1991
- Reprisal and retaliation for reporting wrong doing is prohibited

- **Article 4, Section 4.09** states, "right to representation in investigation
  interviews". 1) each employee should have a right to be represented by the union
  if during a meeting between the unit employee and a management official, the
  unit employee believes that the meeting will result in disciplinary action, the
  employee may request to be represented by the union. If such a request is made,
  the management official should suspend the meeting. The unit employee shall
  immediately notify the union, the management official shall reschedule meeting
  for a later day. (This did not occur on 3/16/04) Right to representation denied and
  disregarded by the above parties. Instead, they strong armed Ms. Batchelor into an

office with premeditated motives to intimidate, scare, and stress her out. Also, when management schedules a meeting for the purpose for disciplining an employee, management should notify the employee of his or her right to representation by the union.

- **Section 4.10 and 13**, employees right to privacy, under searches and seizures by the government of the private property of its employees are subject to constitutions constraints. Individuals do not loose their constitutional rights just because they work for the government. Employees may store personal papers and effects in their offices, desks, and file cabinet's.It should be understood that personal items owned by the employee, such as pocketbooks, briefcases or other items are not subject to search. B) counseling of employees should be done in private. C) Whistle blowing,employees shall be protected against reprisal of any nature for the disclosure of information not prohibited by law, which the employee regards and believes to be evidence of a violation of law, rule, regulation, or evidence of fraud, waste or mismanagement. (Ms. Batchelor reported mismanagement, waste and unethical behaviors to the IG 2/14/04, and was not protected. It resulted in other acts of reprisal daily, leading up to 3/16/04, and presently.

- **Section 24.11**, Ms. Batchelor was also denied her family leave, the department understood Ms. Batchelors' husband was critically ill, and near death, which indeed, he did die, in 06/2004. In which, Mr. Guston, Mr. Pollock, had spread the

30

word around that Ms. Batchelor was lying about her and her husbands' health conditions, most of the time, taking off was due to either his illness or hers. Ms. Batchelor requested FMLA, but Mr. Guston and Mr. Pollock denied it.

- **Article 28, Section 28.01**. Injury compensation. When the employee or representative report and illness or injury has occurred in the performance of duty, the injured employee should be counseled by the management official as to their rights in filing for compensation benefits. Management shall also give appropriate assistance to the employee in filing a compensation claim. (This was not done by the above named management officials, in fact, they misstated many facts to the department of labor claims' examiner about my illnesses, the environment in the office, extremely hostile, to those that did not agree with corrupt biased one sided management decisions, not made in accordance with federal rules.) On the report of injury management official lied, (he stated, I caused the injury, which was not the case, his cruel actions did.) Ms. Batchelors' employee and constitutional rights and protections as a whistle blower to the IG where all denied,disregarded, and management felt they were beyond reproach.

- **Section 28.03**- Employee shall be permitted to review documents pertaining to any claim including compensation. This was denied, when Ms. Batchelor made the request via phone to Mr. Gregory Guston and Jim Pollock to review the CA1, supervisors report, and CA17 after both were completed by management.

31

- **Article 32**, Reasonable Accommodations- Ms Batchelor made many requests to departmental heads for job restructuring, that was denied. Additionally, department had prior knowledge of Ms. Batchelors' illnesses that was first diagnosed to be caused by work related stress in 1992 by her doctor. In 1996, Ms. Batchelor experienced her 2nd episode of harmful, circumstantial stressful, anxiety ridden panic attack, caused by management officials in another department, threatening her with disciplinary actions. This time, Ms. Batchelor resulted in loosing a year and a half of wages. This time also, the department did not make management heads fill out injury reports. This incident was brought about because she told residents the truth about HUD self sufficiency programs. It was at this time Ms. Batchelors' file was documented that she suffered from anxiety and chronic asthma due to work related stress. This proves that management had prior knowledge of Ms. Batchelor having chronic and detrimental illnesses that were and could be aggravated and triggered by extreme acts of reprisal, retaliation and extreme over micromanagement. The pattern continued by management ending with the 03/16/04 incidents causing Ms. Batchelor great harm in many ways. Endangering her health by not following applicable rules and regulations that governs how the management should interact with the employees.

Ms. Batchelor attempted to work, despite the continued pattern of reprisal, retaliation, and a hostile working environment. To no avail, did she succeed. It caused her to take a medical constructive retirement, being concerned about her health, due to the recent

incidents. All of these actions where very stressful for Ms. Batchelor which raised her anxiety level and caused the panic attack leading to a severe condition of chronic asthma being aggravated on that day. She had to receive life support measures from paramedics, and the building nurse to bring her oxygen body level up before they could remove her from inside of her work space on the 22nd floor, departmental enforcement center, where she worked.

HUD is infested with corruption and biased decision making not based on statutory rules and regulations. Secretary Jackson can not oversee that department with trust from the public he practices retaliation and higher management follows course.

Recently in Philadelphia, Mr. Green Housing Authority Official experienced the affect of HUD's schemes of retaliation and reprisal on anyone that objects their corrupt actions. This is a systemic issue. Ms. Batchelor, a retired federal employee, that stood for justice was awarded with harassment, reprisal, retaliation, near death situation where her asthmatic condition was aggravated by the actions of management staff. The series of reprisal/retaliatory action began on a daily basis in February, 2004 when Ms. Batchelor hotlines IG because of her computer being tampered with and files/information was being removed and destroyed.

The good she gave was rewarded with evil that has made her financially destitute. In 1996 interference with OWCP Ms. Batchelor lost almost two years of wages ($150,000) and suffered tremendously, again in 2004 occurred ($100,000)yet the Secretary has done nothing about the perpetrators but the same thing retaliation/reprisal. Management

33

official have created perjury, destroyed documents, and interfered and tampered with a witness (Ms. Freddie Batchelor).

Ms. Batchelor's career was shortened because of management's actions; she was forced to take a constructive retirement and loose over half her retirement benefits. This was taken because Ms. Batchelor's doctor's refused to give her permission to go back into this hostile environment; if she returned it would have been AMA (Against Medical Advice). HUD refused to reassign Ms. Batchelor.

Actions carried out by management caused Ms. Batchelor great harm caused her to be homeless, have to file bankruptcy after her late husband died in June, 2004 along with her illness. She was forced to sell her house in Evergreen to date Ms. Batchelor is in a financial destitute situation. She lost all of her wage income husband as well as her own. Ms. Batchelor has for several years attempted to obtain justice in these matters. It is Ms.

Batchelor's hope that she receives restitution for all the wrong that has occurred and been done to her since 1996 – present time. Ms Batchelor has unduly experience tremendous pain and suffering for taking a stance of good and reporting illegal activity to the Inspector General's Office as well as the Office of Special Counsel in 2004. It was her understanding that whistleblower's had protections but she has found differently.

34

Ms. Batchelor request that she be made whole and restitution given to her in the amount of $ 1.5 million dollars and given an opportunity to use her credentials as a Public Trust Officer and Housing-Development Professional because her career was interfered with and shortened because of not fault of her own as a Public Service Employee. This court has jurisdiction for this case because it involves a career federal employee and a federal agency and programs.

3/21/08

35